In the Matter of ANCHORAGE BOAT
SALES, INC., Debtor.

MIDLANTIC NATIONAL BANK,
Plaintiff,

v.

ANCHORAGE BOAT SALES, INC.,
Debtor and Debtor-in-Possession,
Defendant.

Bankruptcy Nos. 880–00884–17, 880–0113.

United States Bankruptcy Court,
E. D. New York.

June 16, 1980.

Hahn, Hessen, Margolis & Ryan, New York City, by Gabriel B. Schwartz, Gilbert Backenroth and Jerald E. Podair, New York City, for plaintiff.

Jules V. Speciner, Great Neck, N. Y., Arnold M. Schotsky, Melville, N. Y., for defendant.

BORIS RADOYEVICH, Bankruptcy Judge.

On February 22, 1980, Anchorage Boat Sales, Inc., a retailer of new and used pleasure boats, filed a petition for reorganization under chapter 11 of the Bankruptcy Code. On March 3, 1980, the Midlantic National Bank (hereinafter referred to as "Midlantic" or "plaintiff"), a secured creditor which had been providing the debtor with floor plan financing, sought and obtained an order temporarily restraining the debtor from using, transferring or disposing of the proceeds of its accounts receivable, inventory and other collateral subject to Midlantic's security interests and liens. The debtor also was required, by the terms of the order, to segregate all proceeds of this collateral under authority of 11 U.S.C. § 363(c)(4). At the same time, Midlantic sought a preliminary injunction to stop transfer of these proceeds by order to show cause, and commenced an adversary proceeding for permanent injunctive relief of the same nature. Midlantic's complaint also asserts claims for relief from the automatic stay under section 362(d) of the Code, 11 U.S.C. § 362(d); regulation of the sale of collateral in the ordinary course of the debtor's business under section 363(e) of the Code, 11 U.S.C. § 363(e), the segregation of and an accounting for cash collateral in the debtor's possession under section 363(c)(4) of the Code, 11 U.S.C. § 363(c)(4); appointment of a trustee under section 1104 of the Code, 11 U.S.C. § 1104; and the assessment of punitive damages for conversion of cash collateral. The debtor's answer admits that it entered into each and every security agreement which is alleged in the complaint, and denied the balance of the allegations.[1] A trial was commenced on March 12, and concluded on April 16, 1980. Dur-

---

1. The debtor's answer also alleged an affirmative defense that the plaintiff's security agreements were void because of duress, and a counterclaim for induced breach of contract. These were withdrawn, see Transcript of April 28, 1980 (Adversary Proceedings 880–0112, 880–0114), but will be considered in adversary proceedings commenced by the debtor and an affiliate against Midlantic.

ing the trial, the debtor consented to the continuance of the temporary restraining order pending disposition by this Court of the issues herein.

### FINDINGS OF FACT

1. On March 4, 1977, the debtor and Midlantic executed a security agreement under which Midlantic agreed to provide floor plan financing in exchange for a security interest in the debtor's inventory, accounts receivable, certain contract rights relating to inventory, property of the debtor in the possession of Midlantic, and proceeds and products of all of the foregoing. Midlantic perfected its security interest by filing a financing statement with the New York State Secretary of State on March 14, 1977, and with the Suffolk County Clerk on May 18, 1977.

2. Thereafter, the debtor obtained financing from Midlantic in accordance with the terms of the security agreement: the debtor would obtain Midlantic's approval for each new boat purchase, Midlantic would credit a percentage of the purchase price to the debtor's account (usually 100% of the manufacturer's selling price to the dealer), and the debtor would execute a promissory note in the appropriate amount in favor of Midlantic together with a trust receipt and, in certain instances, preferred ship mortgages. Under the terms of the agreement, the debtor agreed to report the sale of each floor planned boat and repay the floor plan loan balance on each boat following its sale to buyers. The debtor has conceded the validity of Midlantic's security interest for purposes of this action.[2]

3. In 1978 and 1979 the debtor alleges that it experienced problems in its bookkeeping system. The officers of the debtor failed to monitor the operations of its bookkeeper, and as a result did not know that Midlantic was not being repaid in full upon the sale of each new boat. In May of 1978, Mr. Louis DeFrisco, the debtor's officer who had assumed bookkeeping responsibilities, ceased functioning as such. In June of 1978, he vacationed in Europe. He returned to the business in July of 1978, and noticed that the debtor's bank balances were higher than expected. Transcript of March 28, 1980, at 91–92. Nevertheless, he did nothing more than give the books a cursory examination. The Court finds that by December of 1978, the debtor had sold a certain number of boats which had been floor-planned by Horizon Credit-Corp., but had failed to remit the proceeds to the lender. Upon discovery of this in December of 1978, the debtor repaid the lender approximately $239,000.00. Transcript of March 28, 1980, at 93–94. In December, 1978, the debtor discharged its bookkeeper, and replaced him with another bookkeeper.

4. Midlantic conducted "floor plan audits" from time to time in order to determine whether boats which it had financed had been sold. On January 17, 1979, one such audit revealed that the debtor had failed to report a certain number of sales to Midlantic. The Court finds that on or about this date, Anchorage had failed to report certain sales and that such unreported sales represented approximately $432,000 in floor plan loans due to Midlantic and unpaid (such sales are hereinafter referred to as sales out of trust).

5. The debtor and Midlantic reached a private accord, and entered into an agreement on February 13, 1979, in which Midlantic agreed to forebear enforcement of its claim against the debtor in exchange for mortgages on parcels of real property owned by the Lindenhurst Channel Marina, Inc.,[3] and the Double L Realty Co., a part-

---

2. As noted above, the debtor and an affiliate have commenced separate actions to challenge the validity of Midlantic's security interests, based upon a claim of duress.

3. Lindenhurst Channel Marina, Inc., is an affiliate of the debtor. Two of its three shareholders are shareholders of the debtor herein. The property encumbered by the mortgage executed at or about the time of the February 13 agreement is the site of a marina, which presumably is Lindenhurst's principal asset. Testimony established that the amount of this mortgage is $1,000,000.

nership.[4] These parties also executed continuing guarantees of the debtor's obligation to Midlantic.

6. A subsequent floor plan audit in May of 1979, and an ensuing meeting involving officers of the debtor and Midlantic, revealed that additional boats had been sold out of trust. The Court finds that these sales accounted for a loan balance due and unpaid of an additional $286,959.47. Upon review of Midlantic's audit, the debtor made a partial payment of the balance due. The debtor and Midlantic again reached a private accord as to the balance outstanding.

7. Under an agreement executed on June 7, 1979, the original security agreement was amended to provide that Midlantic would waive its right to immediate payment of $400,000 in outstanding floor plan payments, in exchange for the debtor's promise to repay a like amount in installments of $5,000 each, at an annual interest rate equal to the prime rate plus two percent. (This agreement is hereinafter referred to as the "term loan.") Additional collateral was provided by Thermacoustics, Inc.,[5] which guaranteed the debtor's obligations to Midlantic and executed a mortgage affecting certain real property located in the State of New Jersey.

8. In December of 1979, the debtor failed to pay the monthly installment due to Midlantic on the term loan. The debtor also defaulted with respect to the term loan installments due in January, 1980 and February, 1980.

9. On February 13, 1980, the debtor stopped payment on a check intended as payment in full to Midlantic following the sale of two floor planned boats, and part payment on a third floor planned boat which had not yet been fully paid for by its retail buyer. The debtor therefore defaulted under the floor plan arrangement again in February, 1980.

10. On February 8, 1980, the balance outstanding in the debtor's floor plan account with Midlantic was $976,242.62, plus interest of $11,045.57. On the same date, the principal balance on the term loan was $318,429.45, plus interest at that date of $10,766.19.

11. By a letter to the debtor dated February 14, 1980, Midlantic withdrew from the floor plan agreement dated March 14, 1977, declared all loans to the debtor in default, and demanded payment of all sums due on that date.

12. The amount due to Midlantic is $1,316,483.83, plus interest from February 8, 1980.

13. It is conceded that Midlantic has a security interest (either under article 9 of the Uniform Commercial Code or under the Ship Mortgage Act) in all floor planned new boats which are in the debtor's inventory, and for which advances were made by the plaintiff. No expert testimony as to the value of these new boats was received in evidence. However, Midlantic introduced evidence showing that, in nearly every instance, it advanced one-hundred percent of the purchase price to the debtor. In addition, Midlantic's exhibits show that the amounts advanced to the debtor to purchase new boats still in inventory as of the date of the petition totalled $734,323.12, exclusive of interest. These boats are largely model year 1978 and 1979 boats. There is no testimony in the record which would indicate that new boats either appreciate in value because of inflation, or depreciate because of age. The debtor's financial statements indicate that the debtor's own accountants value its inventory at the lower of cost or market. Therefore, the Court finds that the value of the debtor's new boat inventory is $734,323.12.

---

4. Double L Realty Co. is a partnership consisting of the two shareholders of the debtor corporation. The partnership has not sought the protections afforded by the Bankruptcy Code. The asset encumbered by the Midlantic mortgage is the site of the debtor's boat sales showroom. Testimony established that the amount of this mortgage was $500,000.

5. Thermacoustics, Inc., is owned in large part by one of the shareholders of the debtor. Thermacoustics has not filed a petition for relief under the Bankruptcy Code.

14. The debtor also concedes that the plaintiff has a security interest in used boats which were taken as trade-ins as part of the sale of floor planned new boats. There was controversy over the proper standard of valuation to be applied to this used boat inventory. Midlantic's expert used a wholesale standard of valuation, and fixed the value of the debtor's encumbered used boats as of the date of the petition at $244,000. The debtor's expert stated that there was no wholesale market for used boats in this part of the country, and used a retail standard to fix the value of the used boat inventory. The retail value, according to this expert, ranged from a low of $344,-000 to a high of $369,800. This Court adopts the $344,000 figure as most consistent with the foregoing analysis concerning new boats.

15. The debtor's financial statement for its fiscal year ending on November 30, 1979, was introduced in evidence by the plaintiff. This shows that the debtor had accounts receivable of $116,585.00 as of November 30, 1979. There is no other evidence in the record which would tend to show the value of the debtor's accounts receivable or contract rights related to encumbered inventory as of the date of the petition. If the fiscal 1979 figure is taken as the approximate amount of accounts receivable due to the debtor as of the date of its petition, it would show that the debtor had accounts receivable of approximately $116,585.00 which are subject to the plaintiff's interests.

16. In view of the foregoing facts, the Court finds that the debtor holds property of a value of approximately $1,194,908.12 which is subject to the plaintiff's interests.

17. Compared with a total indebtedness of $1,316,483.84, exclusive of interest, these figures indicate that there is a deficiency in the debtor's collateral of $121,575.72.

18. The Court finds, in accordance with admissions by an officer of the debtor, that the debtor also engaged in sales out of trust with respect to inventory financed pursuant to security agreements with the Bank of Babylon, Horizon Credit-Corp., and Finan-ceAmerica Private Brands, beginning in May, 1979. Transcript of April 9, 1980, at 18–19, 97–98.

19. The Court finds that the debtor was unable to pay its floor-plan lenders because it had used the proceeds from the sale of floor-planned boats in improving property owned by Lindenhurst Channel Marina, Inc., and in the operation of the debtor's business. In some instances, proceeds due to one floor-plan lender were paid to other floor-plan lenders. Transcript of March 12, 1980, at 86–87. Transcript of March 28, 1980, at 121–22 and 126–28.

20. The prospects for reorganizing this debtor are not good. This is shown by an economic forecast prepared by an employee of the plaintiff with information supplied by the debtor and its accountant in conjunction with a loan application. This forecast indicates that the debtor will suffer a loss, during 1980, of $71,000. The forecast does not take into account that the plaintiff exercised its power, granted by the security agreement, to increase the rate of interest payable by the debtor on outstanding floor plan loans. If this fact is taken into account by fixing the rate of interest at 18 percent, the forecast would project a net loss of $106,000. The debtor's counsel challenged some of the assumptions which formed the basis for the plaintiff's forecast. The assumption that the debtor would have a gross profit margin of 11.5 percent, for example, was challenged on the ground that it included advertising and other promotional costs as a part of the cost of goods sold, but should not have. The Court rejects this contention as unrealistic. Moreover, the Court notes that the debtor's projected gross margin has consistently been higher than the actual gross profit margin for the past few years. Transcript of March 13, 1980, at 82. Another challenge made by the debtor's counsel is based on the debtor's own assumptions of lower operating costs during chapter 11 reorganization. While the Court takes notice of an Order entered in the office of the Clerk of the Court which places a limit on salaries paid to the debtor's officers, in all other respects the record

contains little credible testimony which would support a finding that the debtor has instituted such changes as would make the debtor substantially more profitable than in the past. Indeed, the debtor placed great reliance on the promise that its participation in recent boat shows would bring added profits to the business. *E. g.*, Transcript of March 13, 1980, at 86; Transcript of April 8, 1980, at 43, and 67–68. However, the Court takes notice that an Order of this Court, entered June 9, 1980, authorizes the debtor to return deposits which it had taken on several of such prospective sales.

21. The Court also finds that Mr. Louis DeFrisco, the officer of the debtor who was charged with the responsibility of overseeing the debtor's bookkeeping, was evasive and non-responsive as a witness. His memory was good on direct examination, but conveniently bad on cross-examination. In many instances, his testimony is simply incredible and accordingly has been given little weight.

22. The Court finds that the debtor's accounts continue to be in a state of confusion, not because of bookkeeping problems but because of a lack of money.

23. In view of the foregoing facts, and in view of this Court's experience, the Court finds that there is no possibility that this debtor will be able to successfully reorganize itself.

24. Because of the risk of irreparable harm to the plaintiff which arises from misapplication of the proceeds from the sale of encumbered inventory, and because of the debtor's lack of equity in property which is subject to the plaintiff's interests, the Court finds that on balance, the plaintiff would not be adequately protected if the stay is allowed to continue.

25. In view of the foregoing facts, the Court finds that sufficient cause exists for lifting the automatic stay.

## CONCLUSIONS OF LAW RELIEF FROM STAY

The plaintiff's complaint asserts claims for relief based on section 362(d) of the Code, 11 U.S.C. § 362(d). This section provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

*Id.* Under subdivision (d)(2), which is primarily relied upon in the plaintiff's post-trial memorandum, the creditor has a right to relief from the automatic stay if the debtor has no equity in the property which is subject to the creditor's lien, and such property is not necessary to an effective reorganization. Section 362(g) places the burden of proof on the issue of "no equity" upon the party requesting relief from stay, and the burden of proof on all other issues is upon the party opposing such relief. 11 U.S.C. § 362(g).

Subdivision (d)(2) was added to section 362 of the proposed Bankruptcy Reform Act by House and Senate conferees to enable mortgagees to proceed against non-essential real property in reorganization cases in which the debtor has no equity in the real property. Proposed subdivision (g) of this section was modified, at the same time, to give the complaining creditor the burden of proof on the issue of "no equity." 124 Cong.Rec. H11,092 (daily ed. Oct. 6, 1978). According to the legislative history, subdivision (d)(2) is "intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure," *id.* at H11,-092–93, but is "not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorga-

nization." *Id.* at H11,093. Thus, subsection (d)(2) represents the view of Congress that a creditor is entitled to relief from stay in every case in which the two-pronged test of this subsection is met: relief from stay should be granted if there is no equity in the collateral, *and* the collateral is not essential to an effective reorganization. Congress has thereby taken away a certain amount of the discretion which formerly rested with Bankruptcy Judges under Bankruptcy Rule 11–44, and replaced it with its own value judgment that such facts warrant relief from stay in every instance.

This is not to say, however, that Congress envisioned the application of subsection (d)(2) only to provide relief from the stay of acts against realty. It is true that the legislative history uses real property as an example to show when relief from stay might be warranted. However, the language of the statute is not so limited, and should be read as applying to all property which is encumbered by a creditor's interest, including inventory and accounts receivable.

■ As noted above, the debtor does not have an equity in the property which is subject to the plaintiff's interests. Rather, the debt exceeds the value of the collateral by $121,575.72. The plaintiff contends that it has met its burden of proof under subsection (d)(2) because the debtor has no equity in its collateral and, in addition, the property is not necessary to an effective reorganization because there is no possibility of an effective reorganization.

■ It is undoubtedly true that property is not necessary to an effective reorganization if there is no possibility of an effective reorganization. This point is well taken and supported by ample authority. *E. g., In re Terra Mar Assocs.*, 3 B.R. 462, 6 B.C.D. 150 (D.Conn.1980); *In re Paradise Boat Leasing Corp.*, 2 B.R. 482, 5 B.C.D. 1122 (Bkrptcy. D.V.I.1979) The Court has found that there is a gap of more than $100,000.00 between the value of the collat-

eral and the amount of the plaintiff's claim. It also is clear that the debtor's operations are not likely to be profitable in the course of the next several months. Nothing in the record would indicate that the debtor has an outside source of funds which would enable the debtor to finance a plan of arrangement. All but two floor plan lenders have stopped making loans, Transcript of April 9, 1980, at 17, and only a few boat manufacturers have agreed to supply the debtor with inventory on a consignment basis. Nothing in the record would indicate that the debtor is able to generate sufficient revenues to meet its other obligations. There is nothing before the Court which would indicate that this debtor has any hope of confirming a plan of reorganization. As noted above, the party opposing relief from stay has the burden of proof on all issues other than lack of equity. Accordingly, the Court concludes that the debtor's encumbered property is non-essential property because there is no possibility that the debtor can reorganize itself. The stay should be lifted to allow the plaintiff to proceed, in a court of competent jurisdiction, to foreclose on its security interests.

■ In the alternative, the Court concludes that the plaintiff is entitled to relief under subdivision (d)(1) of section 362. 11 U.S.C. § 362(d)(1). Under this subsection a creditor is entitled to relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." *Id.* In the context of this case, this subsection is in large part a restatement of the law as it existed under the Bankruptcy Act and Rule 11–44.[6] Subdivision (d) of this Rule provided that:

(d) Relief from Stay. Upon the filing of a complaint seeking relief from a stay provided by this rule, the bankruptcy court shall subject to the provisions of subdivision (e) of this rule, set the trial for the earliest possible date, and it shall take precedence over all matters except

---

**6.** If the concept of automatic stay litigation has changed at all with respect to the secured creditor, it is by the elimination of his initial burden

to show irreparable harm. See generally Collier on Bankruptcy ¶ 363.06 (15th ed. 1979) at 363–24 n.9.

older matters of the same character. The court may, for cause shown, terminate, annul, modify or condition such stay. A party seeking continuation of a stay against lien enforcement shall show that he is entitled thereto.

Fed.R.Bankr.P. 11–44(d).

It is apparent that the policy of adequate protection is drawn from cases decided under the Bankruptcy Act and Rule 11–44(d). In those cases, a consensus had developed among Bankruptcy Judges that four factors were most relevant in determining whether a creditor should be granted relief from the stay:

(1) Would continuation of the stay result in an undue risk of material harm to the secured creditor?

(2) Was there a reasonable possibility of reorganization or rehabilitation?

(3) Was the property in question needed by the debtor or necessary to rehabilitation?

(4) Was there an equity in the property that might be realized for the benefit of the debtor or its creditors?

2 Collier on Bankruptcy ¶ 362.01[3] (15th ed. 1979) at 362–21 (15th ed. 1979) (citations omitted). A positive answer to the first question or a negative answer on the second two questions usually resulted in the stay being lifted. A lack of equity usually was regarded as a sufficient ground to lift the stay in chapter VII cases, but was not sufficient standing alone in reorganization cases decided under the Act. *Id.* Because this subsection is based on the concept of adequate protection as it developed in stay litigation under the Bankruptcy Act, the Court should look to these cases to formulate standards for determining whether a creditor would be adequately protected during the continuation of the automatic stay.

In addition to these factors, the Court should compare the value which the creditor might receive if the stay continues without modification and a plan is confirmed with the value which the creditor would receive if the stay is lifted immediately. This is because section 361 of the Code, which uses "adequate protection" as a measure of the relief which the Court may award to a successful section 362 plaintiff, specifies three methods of providing this relief: requiring the debtor or trustee to make periodic cash payments, providing an additional or replacement lien, or granting almost any "other relief" as will allow the creditor to realize the "indubitable equivalent" of its property interest. 11 U.S.C. § 361. All of these methods rely on the value of the creditor's interest in the debtor's property. H.R.Rep. 95–595, 95th Cong., 1st Sess. (1977) 339, U.S.Code Cong. & Admin.News 1978, p. 5787. They are intended to give the secured creditor the value of the collateral for which he bargained. *Id.*

In the instant case, it is clear that the debtor has no reasonable possibility of reorganization and no equity in the collateral. In addition, the plaintiff faces an undue risk of harm from the continuation of the stay as a secured creditor whose interest arises under article 9 of the Uniform Commercial Code. This is the risk of losing its security in cash proceeds which have been commingled. Section 9–306 of the Uniform Commercial Code provides:

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

(b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(d) in all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

(i) subject to any right of set-off; and

(ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

N.Y.U.C.C. § 9–306(4) (McKinney Supp. 1979). Thus, sufficient grounds would have existed under the Bankruptcy Act and Rule 11–44(d) to lift the stay and allow the plaintiff to foreclose its interest.

■ Even in the absence of these grounds, however, the plaintiff would be entitled to relief from the stay because it will not otherwise realize the "indubitable equivalent" of its interest in the collateral. Section 506 of the Code, 11 U.S.C. § 506, indicates that the plaintiff herein will not receive interest on the amount of its claim because there is no equity cushion upon which such payments could be based. That is, under section 506(b), a secured creditor has the right to be paid interest only to the extent that the value of the collateral exceeds the amount of the creditor's allowed secured claim. In the instant case, there is a deficiency rather than an excess. Under section 506(a), the plaintiff would have an unsecured claim against the debtor for the deficiency, but would not have a right to interest on this unsecured portion of the claim. *See* 11 U.S.C. § 502(b)(2). Upon confirmation of a plan, which may occur two or three years hence or not at all, the secured creditor would have a right to be paid the present value equivalent of its allowed secured claim (*i. e.*, in this case that would be the value of the collateral on the effective date of the plan). *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 414–15 (1977) (discussing the time value of money as a factor to be taken into account in providing a "crammed-down" secured creditor with the "indubitable equivalent" of his allowed secured claim).

■ This Court has recognized that the present value of collateral is the value which a secured creditor would realize if he had in his hands today an amount equal to the value of the collateral and was able to reinvest this amount in a way which would produce a return on his investment. This concept therefore takes into account the fact that "payment ten years hence is not generally the equivalent of payment now." *In re Murel Holding Corp.*, 75 F.2d at 943. However, in the instant case, the plaintiff will not be compensated for the loss of the use of its money during the interim between the proceeding for relief from stay and the confirmation hearing. Accordingly, because of the time gap between the present hearing and the confirmation hearing, the plaintiff will not receive the "indubitable equivalent" of the value of the collateral unless relief from the stay is granted herein. *See generally In re Murel Holding Corp.*, 75 F.2d 941, 943 (2d Cir. 1935); 124 Cong.Rec. H11,103 (Sept. 28, 1978) (indicating that the "indubitable equivalence" standard is taken from *In re Murel Holding Corp.*).

Code Section 361 makes it incumbent upon the debtor to propose some form of relief as will adequately protect the plaintiff's interest in the collateral. The debtor is free to choose any method which is specified in subsections (1) or (2) of Code section 361 in order to compensate the plaintiff for the loss of its use of the collateral. The debtor is also free to propose some other form of relief, subject to the approval of this Court, as will meet the standards set forth in section 361(3) of the Code. The debtor's counsel, in his post-trial memorandum, has proposed only the continued segregation of cash collateral and an accounting for the same as a means of providing adequate protection. No other proposal has been made. For reasons which have been fully set forth in the foregoing analysis, this Court does not view this proposal as sufficient to provide adequate protection for the plaintiff's interests. Accordingly, the plaintiff should be granted relief from the stay

and, pending further order of this Court, all cash collateral should be subject to segregation and an accounting.[7]

### SECTION 363(e) CLAIM

Section 363(e) of the Code provides that:

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 363(e). In the context of the instant case, section 363(e) is duplicative of the rights afforded to creditors under section 362(d). In applying each of these sections, the Court is directed by the Code to section 361 to determine the measure of relief necessary to provide the creditor with adequate protection. Therefore, the adequate protection analysis which this Court has undertaken in considering the proper measure of relief under section 362(d) applies to the plaintiff's section 363(e) claim as well, and need not be repeated here. It will suffice to hold that in order to be adequately protected within the meaning of this section, the plaintiff has the right to have the debtor segregate and account for cash collateral.[8]

### APPOINTMENT OF A TRUSTEE

 Under section 1104(a) of the Code, the Court may order the appointment of a trustee

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or

similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a). As enacted, subsection (a)(2) provides a flexible standard for the appointment of a trustee. *In re Hotel Assocs., Inc.*, 3 B.R. 343, 6 B.C.D. 160 (Bkrptcy. E.D.Pa.1980), *In re Parr*, 5 B.C.D. 1143 (E.D.N.Y.1979). *See generally* 5 Collier on Bankruptcy ¶ 1104.01 (15th ed. 1979) at 1104–17. The appointment of a trustee in a chapter 11 case is an extraordinary remedy, and one which may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code. *In re Hotel Assocs., Inc., supra.* In many cases, the appointment of a trustee may preclude an effective reorganization because of the substantial administrative expenses which must be paid by the debtor's estate. Accordingly, under subsection (a)(2), the Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders, and other interests of the estate. *In re Hotel Assocs., Inc., supra.*

Under subsection (a)(1), the Court's discretionary powers are more circumscribed. Here, the Court's discretion is limited to a determination of whether "cause" exists for such appointment, and such "cause" must be in the nature of "fraud, dishonesty, incompetence, or gross mismanagement" of the debtor by current management, either before or after the commencement of the

---

**7.** The Court takes notice that an adversary proceeding has been commenced by Citibank, No. 880–0281, which seeks a determination that the plaintiff therein has a senior lien on the debtor's used boat inventory. The Court also notes that Midlantic has been made a defendant in that adversary proceeding, but Citibank is not a party in this proceeding. Therefore, in accordance with Bankruptcy Rule 719(c), the Court will not make a determination of rights in the segregated cash collateral in the instant proceeding.

**8.** *See* note 7 *supra.*

case. Since one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11, the Court must find something more aggravated than simple mismanagement in order to appoint a trustee. Such facts as reflect upon the abilities and integrity of current management would warrant the appointment of a trustee under subsection (a)(1), *In re LaSherene, Inc.*, 3 B.R. 169, 6 B.C.D. 153 (Bkrptcy. N.D.Ga.1980).

██ As noted above, the debtor failed to adequately supervise its bookkeeper during a large part of the year 1978. This was a contributing factor to sales out of trust, which occurred during 1979, after the discharge of the previous bookkeeper. In view of these facts, and in view of the misapplication of proceeds and confusion in the debtor's accounting system, this Court believes that sufficient cause exists within the meaning of subsection (a)(1) to justify the appointment of a trustee.

### SECTION 363(c)(4) CLAIM

Section 363(c) of the Code provides (in pertinent part):

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing authorizes such use, sale, or lease in accordance with the provisions of this section.

. . . . .

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segre-

gate and account for any cash collateral in the trustee's possession, custody, or control.

11 U.S.C. § 363(c). Since the plaintiff herein has a security interest in the proceeds of encumbered inventory under the terms of its security agreement with the debtor, the Court has concluded that segregation of these proceeds is necessary to provide the plaintiff with adequate protection for its interest. To this extent, section 363(c)(4) duplicates the protections afforded by sections 361, 362(d) and 363(e). However, section 363(c)(4) goes a step farther than these sections by making the debtor's obligation to segregate and account for cash collateral mandatory.

### INJUNCTIVE RELIEF

In view of all of the foregoing, the debtor should be enjoined from taking any action to transfer, sell or dispose of cash collateral which is subject to the plaintiff's interests, pending further order of this court.

### PUNITIVE DAMAGES

██ The complaint alleges that the debtor has engaged in a concerted effort to violate the terms and conditions of its security agreement with the plaintiff with willful and malicious disregard of the plaintiff's rights and for the purpose of converting unreported sales to the debtor's own use. There is no evidence in the record, and the Court has made no finding of fact, which would support this allegation. At best, the facts show a course of conduct which stems from honest confusion and a lack of money. Accordingly, this Court will not assess punitive damages against the debtor.

Relief in all other respects should be denied.

Settle judgment in accordance herewith.