In re **GENERAL OIL DISTRIBUTORS, INC.**, Debtor.

**Bankruptcy No. 882–80516–20.**

United States Bankruptcy Court,
E.D. New York,
at Westbury.

July 27, 1984.

---

Steven Cohen, Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for Allen and Gerald Wechter.

Glenn B. Rice, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Creditors Committee.

Joan B. Gross, Townley & Updike, New York City, for Amoco Oil Co.

George H. Colin, Baer, Marks & Upham, New York City, for Gulf Oil.

Samuel D. Rosen, Milgrim, Thomajan, Jacobs & Lee, New York City, for Horizon Products Co.

Lester M. Kirshenbaum, Levin & Weintraub, New York City, for debtor.

## MEMORANDUM AND ORDER

ROBERT JOHN HALL, Bankruptcy Judge.

The court has before it the motion of Gulf Oil Corporation ("Gulf"), seeking the appointment of a trustee under 11 U.S.C. § 1104(a) ("trustee motion"). This motion was instituted by Horizon Products Company ("Horizon") on November 30, 1983. Gulf informally became a participant during the initial hearings on this matter. When Horizon and the debtor, General Oil Distributors, Inc. ("G.O.D."), sought to settle the matter, Gulf vigorously objected. By Decision dated April 17, 1984, this court held that Horizon could withdraw from the prosecution of the motion and that the terms of the settlement, with one exception, would be approved. The exception was that Gulf's rights to continue prosecuting the trustee motion would not be hindered. Gulf chose to fight for the appointment of a trustee, and hearings continued until their conclusion on June 4, 1984, at which time the court reserved decision.

The initial return date of the trustee motion coincided with the hearing to consider the adequacy of the debtor's disclosure statement. As ancillary relief, Horizon sought a stay of consideration of the debtor's disclosure statement. The court effectively granted the stay by adjourning

the disclosure statement hearing pending the completion of hearings on the trustee motion.[1] After reviewing all of the evidence presented, as well as the arguments of counsel, the court herein denies the motion seeking the appointment of a trustee, and reschedules the hearing to consider the adequacy of the debtor's disclosure statement.

## I. FINDINGS OF FACT

### a. The Debtors

1. This case involving G.O.D., was commenced by the filing of an involuntary petition under chapter 7 on March 3, 1982. On March 5, 1982, G.O.D. converted this case to a proceeding under chapter 11 by the filing of a voluntary petition under that chapter.

2. G.O.D.'s chapter 11 was followed by the chapter 11 filings of three of its affiliated companies: Wechter Petroleum Corporation, Southville Industries, Inc. and Inwood Petroleum Corporation. (The four chapter 11 companies are collectively referred to as the "Debtor Companies".)

3. The Debtor Companies are all subsidiaries of Southville Oil Corporation ("S.O.C."), whose common stock is owned 50% by Gerald Wechter ("Gerald") and 50% by Allen Wechter ("Allen"). S.O.C. also owns seven other non-debtor companies.

4. Since the summer of 1980, Gerald has functioned as G.O.D.'s chief operating officer. As of June 4, 1984, the date of the last hearing on this matter, both Gerald and Allen were officers, directors, and principal shareholders of G.O.D., but Allen had not functioned in management and had not received any salary since the spring of 1982.

### b. Conduct of Management

5. Between 1977 and the summer of 1980, Allen borrowed funds from G.O.D. while acting as its chief operating officer. These loans have not been repaid.

6. In or about August 1980, Allen withdrew approximately $1,000,000 from G.O. D.'s account in Houston, Texas to fund General Oil & Refining Corporation ("G.O. R."), a new corporation conducting the same business as G.O.D. and owned solely by Allen, and in which Allen had invested capital of only $1,000. After Gerald became aware of the withdrawal, he demanded its return. Allen thereafter returned $900,000 of the money.

7. In the summer of 1980, various assets of G.O.D., including office furniture, fixtures, equipment, trucks, and Rolls Royce and Mercedes-Benz automobiles, which were located in Texas, were transferred to G.O.R. as a partial advance payment for the proposed sale by Allen of his Southville Oil stock back to Southville Oil.

8. While Allen managed G.O.R., he borrowed $5,000,000 from G.O.R. on behalf of other corporations owned wholly by him. This borrowing occurred even after June of 1981 when G.O.R. was insolvent. The loans were made without providing G.O.R. with adequate security.

9. In a one month period ending April 23, 1981, Allen borrowed $495,000 from G.O.R. for his own purposes.

10. Before and after June 1981, Allen caused G.O.R. to make loans to Allen personally and to entities in which Allen had a financial interest, such as Channelview Terminal Corporation, Texas Country, Inc., Extemp, Inc., Petro-Tex Terminal Corporation, Inwood Trucking, Astro Energy Corporation, Texas Laboratories, Inc. and Diesel King.

11. Allen borrowed monies from G.O.R. to invest in a restaurant and in a magazine.

12. Allen used a Rolls Royce automobile purchased by G.O.D. for his personal affairs. Allen improperly set off the proceeds from the sale of the automobile to partially satisfy monies due from G.O.D. to Allen's Texas corporations.

13. Gerald borrowed $1,750,000 from G.O.D. in 1981 for his own securities and

---

**1.** On February 16, 1984, the court adjourned the hearing on the debtor's disclosure statement *sine die.*

commodities speculation, purchases of race horses and other personal purposes.

14. Gerald defaulted under contracts to purchase condominiums at Bayou Bend, Houston, resulting in the forfeiture of his investment of $127,000 and the probable forfeiture of G.O.D.'s investment of $212,-000.

15. In December of 1981, Gerald took positions in oil futures that were the reverse of positions that were taken by G.O.D. under his supervision in the same period.

16. Gerald substantially withdrew from commodity futures speculation in January of 1982 after his broker recommended withdrawal. Gerald, however, permitted G.O.D.'s continued commodity futures trading.

17. Allen did not participate in the business, nor was he on the payroll of G.O.D. or S.O.C. from August, 1980 until late 1981.

18. In January 1982, shortly before the filing of the bankruptcy, Allen and Gerald credited themselves, as officers and employees of G.O.D., with bonuses of about $153,000 for Gerald and about $373,000 for Allen, in order to reduce their large indebtedness to G.O.D.

19. At the time the aforementioned credits were made to Allen and Gerald, G.O.D. was in financial straits.

20. Gerald approved the aforementioned credits from G.O.D. to Allen in order to quell the outstanding litigation between Gerald and the Southville Oil group of companies and Allen and his Texas companies.

21. After obtaining the bonuses aforementioned, Gerald and Allen owed G.O.D. approximately $500,000 for loans and advances.

22. Gerald and Allen paid no interest on advances from G.O.D. not embodied by notes.

23. Allen has a dismal business record, having failed in the following business ventures: Texas Country Inc.; Extemp. Inc.; Inwood Trucking of Texas; Petro Texas Terminal Corporation; Texas Laboratories; and Diesel King.

#### c. G.O.D.'s Financial Straits

24. At the end of 1980, G.O.D. had a negative net worth of approximately $918,-000. During 1980 G.O.D. sustained a loss of over $1,790,000. During 1981, however, G.O.D. operated profitably, earning a profit of over $1.1 million for its fiscal year, ending September 30, 1981. During that fiscal year G.O.D.'s retained earnings increased from $300,000 to over $1 million.

25. G.O.D. began experiencing severe cash flow problems in approximately December 1981, primarily as a result of:

(a) Losses suffered in its trading activities on the mercantile exchange which arose because of Gerald's failure to order the liquidation of G.O.D.'s futures positions. Gerald's failure in this regard occurred at a time when he himself had ceased trading personally in the market because of impending dangers.

(b) The loss of $1 million suffered in connection with a transaction with Horizon Products, which occurred when Horizon withheld the $1 million due to G.O.D. because Horizon was owed about $2 million by Allen's company, G.O.R., and G.O.D. had failed to notify Horizon and other G.O.R. creditors that G.O.D. and G.O.R. were separate companies.

(c) The numerous loans and advances made by Gerald and Allen to themselves over the previous two years.

26. G.O.D. attempted to deal with these problems by obtaining an increased credit line from its bank, Marine Midland. In February 1982, Marine Midland agreed to increase G.O.D.'s credit line from $4 million to $6 million upon execution of personal guarantees by Gerald and Allen Wechter, and the execution of corporate guarantees and mortgages securing those guarantees by Southville Industries and Inwood Petroleum. Those documents had all been executed and delivered to Marine Midland at the time that the involuntary petition against G.O.D. was filed.

27. Two of the Debtor Companies, Southville Industries and Inwood Petrole-

**406**

um, have almost no unsecured debt. They were put into chapter 11 solely for the purpose of facilitating the consummation of the financing arrangement between G.O.D. and Marine Midland. After G.O. D.'s chapter 11 filing, Marine Midland took the position that it would not accept the guarantees and mortgages from Southville Industries and Inwood Petroleum as security for G.O.D.'s obligations, unless those companies also were placed under the bankruptcy court's jurisdiction and the court authorized the execution of those documents.

28. A creditors' committee for G.O.D. (the "Committee") was appointed by order of this court dated March 10, 1982. Gulf has been a member of the Committee since its inception, and has attended all Committee meetings. No creditors' committees were appointed for any of the other Debtor Companies.

29. Hearings were held in this court on March 15, 16, 18, 19 and 29, 1982 to consider G.O.D.'s request to enter into a financing arrangement with Marine Midland, and to assume certain executory contracts. During the course of those hearings questions were raised concerning alleged improper conduct by the debtors and by the Wechters. To a large extent, the allegations raised in connection with the present motion of Gulf for the appointment of an operating trustee are repetitive of the allegations first raised in this Court over two years ago.

30. Each session of the financing hearing was attended by, among others, separate counsel for each of the following members of the creditors' committee: Crown Central Petroleum Corporation, Royal Petroleum Corporation, Poling Transportation Corporation, Northville Caribbean Corporation and Tipco Products, Inc. In addition, the final hearing on March 29 was also attended by counsel for Committee member Cities Service and by the Otterbourg Steindler firm, counsel for the Committee.

### d. The Decision to Retain a Management Firm

31. Subsequent to the financing hearings, during an April 1982 meeting, the Committee considered the issue of seeking the appointment of an operating trustee for G.O.D.

32. During the course of its deliberations, the Committee considered, among other things, G.O.D.'s position that the appointment of a trustee would create a stigma and discourage the company's customers and suppliers from continuing to do business with it.

33. The Committee was concerned that if a trustee were appointed, additional professionals would be retained, much work would be duplicated, and substantial additional costs of administration would be incurred.

34. During that meeting Gerald, the debtors' chief operating officer, agreed to the Committee's proposal that if a manager were retained rather than a formal operating trustee, that manager would exercise control over all four Debtor Companies, rather than just G.O.D., and would have access to the books and records of all non-debtor companies as well.

35. The Committee decided that it would undertake to retain a manager for the Debtor Companies, with the powers of an operating trustee.

36. Thereafter, a subcommittee established by the Committee interviewed various applicants for the position and ultimately selected Alco Enterprises ("Alco").

37. Alco is a company that has had broad experience in bankruptcy and reorganization proceedings. Among other things, it has served as consultant in such well known cases as W.T. Grant, United Merchants & Manufacturers, Eagle Clothiers, City Stores, Kings Department Stores and Lionel. It is currently serving as trustee in two cases pending in the Southern District of New York, one a chapter 7 case and the second a chapter 11 case.

38. Upon its selection, Alco retained the law firm of Weil Gotshal & Manges to negotiate a management agreement on its behalf with the Debtor Companies. The agreement provided that Alco was retained

as manager for all four Debtor Companies with "such powers as would be exercised by an operating trustee under Chapter 11 of the Bankruptcy Code."

39. Alco's retention under the terms and conditions of the management agreement was approved by this court *nunc pro tunc* as of May 17, 1982, by order dated July 2, 1982.

40. Alco actually began its management services in May 1982. While it was officially retained as manager of all four Debtor Companies, Alco initially reviewed the records and operations and developed an overall analysis of all eleven Southville Oil companies. The major review of the companies' books and records was conducted by the Main Hurdman accounting firm—which had been retained by Alco as accountants to the Debtor Companies. The books and records of all the Southville Oil Companies were also reviewed by the Committees' accountants, Ernst & Whinney, with the cooperation of those companies.

41. Alco continued to manage the businesses of the Debtor Companies on an active basis for approximately one year. During that period, Alco maintained a daily full-time presence at the debtor's premises, and carried out such functions as reviewing and approving all purchase, sale and other agreements, approving and countersigning all checks, reviewing employee responsibilities, and meeting with potential financiers and third party investors. Alco also attended all Committee meetings and reported regularly to the Committee and to its counsel with respect to all of its activities.

42. From the very outset, Alco received cooperation from G.O.D.'s officers and employees. In particular, Alco worked closely with Gerald, who assisted in such matters as sales, collections, and customer and employee relations.

43. A series of investigations concerning G.O.D., the Wechters and their respective affairs were conducted by a number of parties. For example:

A. In connection with the Committee's consideration of substantive consolidation, Ernst & Whinney conducted an investigation of the intercompany transactions and other aspects of the working relationships between G.O.D. and the other Southville Oil companies. Ernst & Whinney found that each Southville Oil company maintained separate books and records, and it appeared as if each company stood by itself.

B. Ernst & Whinney, Main Hurdman, and the debtors' litigation counsel—Proskauer Rose Goetz & Mendelsohn—conducted investigations into the relationship between G.O.D. and Pride Oil, one of the non-debtor companies. It was found that all transactions between G.O.D. and Pride involving the movement of product or cash were recorded on the books and records.

C. During the course of a deposition taken over two days, Otterbourg Steindler investigated Gerald Wechter's personal financial affairs and his transactions with G.O.D. Ernst & Whinney reviewed all documents and exhibits produced at that deposition.

D. Ernst & Whinney reviewed the bonuses (in the form of forgiveness of debt) received by Gerald and Allen in late 1981, and reported on that subject to the committee on April 20, 1982.

(E) Otterbourg Steindler, Ernst & Whinney and Alco conducted an extensive investigation into the affairs of Allen's Texas corporations, and their relationship with G.O.D.

The Committee was apprised of, and discussed, each of these investigations, and their findings.

### e. The Suspension of Alco's Management Services

44. By the summer of 1983, the debtor and the Committee had agreed upon the essential elements of a plan and the Debtor Companies had begun showing a profit.

45. At that time, upon the Committee's request, Alco phased down and eventually suspended its management services on behalf of the Debtor Companies. It was the Committee's position that the continued

substantial costs arising in connection with a third party manager or overseer of the Debtor Companies was no longer warranted or economically justifiable.

46. Gulf was present at the Committee meetings where it was decided to have Alco phase down and, thereafter, terminate its services. Everyone present at the meetings, including Gulf, voted in favor of that proposal.

47. When Alco suspended its services, Gerald reassumed his position as chief operating officer of the Debtor Companies, a position that he had held from the summer of 1980 until May of 1982.

48. Since Gerald has resumed operating control, the Debtor Companies have earned substantial profits. According to the Debtor Companies' operating statements filed in this court and the testimony at trial, during the thirteen month period ending January 31, 1984, the Debtor Companies earned a profit of approximately $1.8 million. The operating statements on file for February, March and April show that during those months, the Debtor Companies earned additional profits of $224,000, $227,000 and $222,000, respectively. The bulk of the aforementioned profits were generated by G.O.D.

49. The appointment of a trustee for G.O.D. would not be received very well within the oil community, and could cause G.O.D. difficulty in its ability to obtain customers and sources of supply.

50. No evidence was presented to the effect that since the inception of this bankruptcy case, either of the Wechters have conducted themselves in a manner adverse to the interests of the Debtor Companies, or their creditors as a whole.

## II. DISCUSSION

Section 1104 of the Bankruptcy Code states that:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

■ The appointment of a trustee under 11 U.S.C. § 1104 is an extraordinary remedy, *In re Tyler*, 18 B.R. 574, 577 (Bankr.S.D.Fla.1982), which should not be made lightly. *Official Creditors' Committee v. The Liberal Market, Inc.*, 13 B.R. 748, 752 (Bankr.S.D.Ohio 1981); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 686 (Bankr.D. C.Cir.1980). Consequently, the party seeking the appointment bears the burden of proof, *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 159 (Bankr.D.Me.1982), and said burden must be carried by clear and convincing evidence. In *Tyler*, 18 B.R. at 577; *Liberal Market*, 13 B.R. at 751.

■ A determination of whether sufficient "cause" exists to appoint a trustee compels the court to "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Main Line Motors, Inc.*, 9 B.R. 782, 784 (Bankr.E.D. Pa.1980), *aff'd*, No. 80-4444 (E.D.Pa.1981). These equitable considerations are clearly the focus of a determination under § 1104(a)(2), where the court is explicitly called upon to assess the interests of creditors and others involved in the estate. *Id.* Gulf, however, urges that such subjective considerations are irrelevant and immaterial in a decision under § 1104(a)(1). Gulf emphasizes the section's use of "shall" in the words "the court shall order the appointment of a trustee for cause, including fraud, dishonestly, incompetence, or gross

mismanagement...." Gulf argues therefrom that upon a finding that management has been incompetent, dishonest, or has committed acts of fraud or gross mismanagement, the court *must* appoint a trustee.

■ Although the word "shall" in § 1104(a) circumscribes the court's discretion, the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct. While under § 1104(a)(1) the court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore competing benefit *and harm* that such an appointment may place upon the estate. *See Main Line Motors,* 9 B.R. at 784. Implicit in a finding of incompetence, dishonesty, etc., for purposes of § 1104(a)(1), is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee. Under Gulf's view, the court can not consider factors such as improvement in the competence of management and other kinds of reformed conduct, and the costs that the appointment of a trustee would bestow upon the estate. Gulf's view would mandate appointment of a trustee for a single act of pre-petition incompetence or dishonesty. As one court observed, "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11." *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635, 645 (Bankr.E. D.N.Y.1980); *see* 5 *Collier on Bankruptcy* ¶ 1104.01[c] at 1104–21 (15th ed. 1983) ("The language of subsection (a)(1) represents tacit recognition that some degree of mismanagement exists in virtually every insolvency case. The philosophy of chapter 11 is to give the debtor a 'second chance' and, consistent with such philosophy, current management should be permitted to identify and correct its past mistakes.") Under Gulf's suggested approach, the court would be forced to appoint a trustee in most chapter 11 cases. Certainly, how-

ever, such an appointment was meant to be the extraordinary exception and not the rule. *Tyler,* 18 B.R. at 577; *see Liberal Market,* 13 B.R. at 752; *1243 20th Street,* 6 B.R. at 686. There is a strong presumption that a debtor remains in possession absent a showing of need. *In re F.A. Potts & Co., Inc.,* 20 B.R. 3, 7 (Bankr.N.D.Ala.1980). Furthermore, in view of the court's uncircumscribed power to terminate the appointment of a trustee under § 1105, it would be illogical to think that upon a showing that management had been slightly incompetent or dishonest on one occasion, despite the fact that the appointment of a trustee would be harmful to everyone involved, the court would have to first appoint a trustee, and immediately thereafter could grant a motion to terminate that appointment.

In view of the foregoing, the court considers as relevant in its decision of whether the conduct of the Wechters rose to a level sufficient to warrant the appointment of a trustee, that:

1) Gulf is a member of the Committee, and over two years ago was aware of virtually all of the allegations made in the present trustee motion.

2) Gulf was a member of the Committee when it decided to retain Alco to manage the debtor companies instead of seeking the appointment of a trustee, and after considering Alco's detailed reports, Gulf joined in the unanimous vote of those present to phase down and thereafter terminate the services of Alco.

3) The Committee voted to terminate the services of Alco because they correctly believed that the costs of a third party manager was no longer needed or economically justified.

4) In the stipulation of settlement approved by the court in its Decision dated April 17, 1984,[2] G.O.D. agreed to keep its books and records available for inspection and examination by the Committee's accountants until the debtor's proposed plan was confirmed.

---

**2.** The stipulation was approved to the extent it did not affect Gulf's rights to continue to prose-

cute the Trustee motion.

5) The motion to appoint a trustee in this case was made over one year and a half after the commencement of this case, and long after Gulf was aware of virtually all of the allegations made therein.

6) Alco has already functioned for approximately one year in a role as a supervisory trustee.

7) G.O.D.'s attorneys have been more than diligent in their efforts toward confirmation of a workable plan of reorganization. The trustee motion has already delayed their efforts for over six months.

8) The Committee has vigorously contested the motion to appoint a trustee, citing the expense of a trustee, the late stage of the reorganization proceedings, and the various methods by which the committee has and will continue to supervise the management of the debtors.

9) Allen has not been active in the management of the debtors, nor has he received any salary since the spring of 1982.

10) Under the present management of Gerald Wechter, G.O.D. has shown significant profits, the more recent of which are not entirely attributable to the past retention of Alco.

11) The appointment of a trustee could cause G.O.D. difficulty in its ability to obtain customers and sources of supply.

12) Although probably more in the nature of self-preservation and reparation than in the nature of magnanimity, the Wechters are willing to contribute assets of the non-debtor Southville Oil Companies and to put up their personal credit and assets in aid of a successful reorganization.

13) Appointment of a trustee in this case would impose a substantial financial burden on an estate already burdened by large administration expenses. *See In re Hotel Associates, Inc.,* 3 B.R. 343, 345 (Bankr.E. D.Pa.1980); *In re Tyler,* 18 B.R. 574, 578 (Bankr.S.D.Fla.1982); *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635, 644 (Bankr.E. D.N.Y.1980); *In re F.A. Potts & Co., Inc.,* 20 B.R. 3, 7 (Bankr.E.D.Pa.1981).

■ In essence, the above findings of fact and relevant considerations require the court to deny Gulf's motion for a trustee. The findings show numerous instances of conduct approaching gross mismanagement, violations of fiduciary obligations, incompetence and dishonesty on behalf of Gerald, and more so on behalf of Allen. Under the circumstances herein, the court must find that their conduct does not constitute that which would mandate the appointment of a trustee.

With the benefit of hindsight, the conduct of the Wechters demonstrates mismanagement to say the least; their continued borrowing and futures trading during G.O.D.'s financial turmoil certainly were major factors precipitating the involuntary petition. Nevertheless, as demonstrated by the then huge swings in oil prices, the oil industry was such that both huge profits as well as huge losses could be made at any given moment. The success of current management and the lack of any evidence of post-petition misconduct demonstrates that Gerald has learned a hard lesson. Under the watchful eye of G.O.D.'s creditors, the court is convinced that their interests are better served by permitting Gerald to lead G.O.D. into reorganization, rather than by saddling the estate with the expense of a trustee and additional counsel. Allen is currently not functioning as manager of G.O.D., and his future role in such a position will be in the hands of G.O.D.'s creditors when they consider the debtor's plan of reorganization. If as Gulf states, "the creditors demanded and required [Alco] because of an overwhelming and almost unanimous lack of confidence and trust in Gerald and Allen," then the creditors can effectively demand provisions in the debtor's plan for periodic accountings or the institution of new management. In fact Gulf, or any other creditor, can propose its own plan containing such provisions. The evidence indicates that the largest creditors are willing to work with Gerald in his efforts to reorganize G.O.D. In view of the late stage of this chapter 11 case, the watchful eye of creditors, the lack of evidence of any post-petition wrongdo-

ing, and the profitability of G.O.D. under current management, the court denies Gulf's motion.

III. CONCLUSION

In accordance with the above memorandum, it is ORDERED that Gulf's motion seeking the appointment of a trustee under 11 U.S.C. § 1104(a) is hereby denied, and it is FURTHER ORDERED that the adjourned hearing on the debtor's disclosure statement pursuant to 11 U.S.C. § 1125 is hereby rescheduled to August 21st, 1984 at 9:30 A.M.

Approved for jurisdictional purposes.

So Ordered.

/s/  Leonard D. Wexler

U.S.D.J.

Dated: Uniondale, N.Y.
   August 1, 1984