**In the Matter of The McCORDI CORPORATION, Debtor.**

**Bankruptcy No. 80–B–20308.**

United States Bankruptcy Court, S. D. New York.

Sept. 17, 1980.

Ullman, Miller & Wrubel, P.C., New York City, for Nordic American Banking Corp.

Finkel, Goldstein & Berzow, New York City, for debtor.

## DECISION ON MOTION FOR AN ORDER APPOINTING A TRUSTEE AND AN EXAMINER

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Nordic American Banking Corporation ("NABC"), a secured creditor in this Chapter 11 case, seeks an order; (1) appointing a trustee for cause, pursuant to 11 U.S.C. § 151104(a), to operate the business of the debtor and investigate the prior operation of its business, the financial condition of the debtor and the desirability of continuing the debtor's business; or, alternatively, (2) appointing an examiner, pursuant to 11 U.S.C. § 151104(b), to make such investigation. NABC premises its application on the grounds that the debtor allegedly defrauded NABC and acted dishonestly by illegally kiting checks; knowingly submitting false projections of earnings and sales and by paying rent to an entity controlled by its shareholders which may be above the fair market value for the premises.

On July 15, 1980, the debtor, the McCordi Corporation, filed a Petition for Reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 1101 *et seq.* The Chapter 11 petition followed the commencement of a lawsuit by NABC against the debtor in which NABC obtained a temporary restraining order enjoining the debtor's customers from paying the balances due and preventing Barclays Bank of New York ("Barclays") from honoring checks drawn by the debtor.

This court, after notice and hearing, lifted the state court restraint as inconsistent with §§ 362, 363 and 541 of the Bankruptcy Code.

Thereafter, NABC moved for the appointment of a trustee, or in the alternative, the appointment of an examiner. The debtor and the creditors' committee appeared at the hearing in opposition to the motion, resulting in the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The debtor is a New York Corporation with its principal place of business at 707 Fenimore Road, Mamaroneck, New York.

2. NABC is a banking corporation organized and existing under the banking laws of the State of New York with its principal place of business at 600 Fifth Avenue, New York, New York.

3. The debtor filed its voluntary Petition for Reorganization under Chapter 11 of the Bankruptcy Code on July 15, 1980 and continues to operate its business in accordance with Code § 1108. It is engaged in the business of manufacturing and distributing vinyl wall covering and allied products.

4. In July, 1978, the debtor's shareholders sold their interest to a corporation known as Hall Products, Inc. ("Hall") controlled by a Lillian Davison, who became president of the debtor. NABC helped finance the acquisition by Hall and Ms. Davison, with the result that the debtor executed and issued to NABC an "Unlimited Guaranty" dated July 31, 1978 [Exhibit # 2].

5. In July 1979, Lillian Davison and the debtor commenced an action in the United States District Court for the Southern District of New York against the former shareholders to rescind her stock purchase and for damages. [Exhibit # 1] The suit was settled upon payment made to Ms. Davison and her return of the debtor's stock to its former shareholders. In April, 1979, Marvin Blatt became president of the debtor and Charles Billups became its vice president. Blatt owns no shares of the debtor and Billups owns less than 1% of the outstanding shares.

6. Following negotiations with NABC with respect to the debtor's obligation to NABC, the debtor signed a demand promissory note in favor of NABC, dated October 10, 1979, in the principal sum of $800,000. [Exhibit # 3] The debtor also signed a "Continuing General Security Agreement" dated October 10, 1979, [Exhibit ¶ 4] granting NABC a floating lien on its tangible and intangible property then in existence and thereafter acquired. These documents

were executed after a conversation between Blatt and a representative of NABC whereby Blatt was informed that the amount that the debtor then owed to NABC was $782,000, and that the debtor was entitled to receive an additional $18,000, representing a total due from the debtor of $800,000.

7. In February, 1980, the debtor approached New York Life Insurance Company for a loan of $1,000,000. to pay off the NABC obligation of $800,000 and to obtain $200,000 for working capital [Exhibit # 7] which the debtor could not obtain from NABC. In connection with this request, the debtor furnished New York Life Insurance Company with a financial projection indicating that with the infusion of $200,000 of working capital, the debtor would have sales and income for the year ending January 31, 1981 of $4,000,000 and net income of $200,000 [Exhibit # 7]. The debtor did not obtain the $1,000,000 loan.

8. Two months later, in April 1980, NABC requested the debtor to furnish a long–term projection involving business potential and profit potential. The debtor submitted a sales projection for the fiscal year 1980–1981 of "6 to 7 million dollars" and a request for an additional $500,000 for working capital. The debtor sought check overdraft privileges from NABC and concluded with "You must help us with a full hand and heart. Cut rate methods are mutually self–defeating." [Exhibit # 9]

9. Although the projection given to NABC differs from the one previously given to New York Life Insurance Company and does not reflect the true lower sales volume that thereafter was ultimately achieved by the debtor, it does not necessarily follow that the projection amounts to a fraud upon NABC. It must be treated for what it was worth; simply a projection and not a representation of actual facts. The debtor's projections as to future sales and income appears to have been unduly optimistic. However unfounded the projections were, representatives of NABC were sufficiently sophisticated and knowledgeable as to the debtor's tight financial position so as not to advance the $500,000 for working capital as requested and to insist upon the receipt of covering funds before honoring the debtor's checks. It is the debtor's failure to provide covering funds that leads to the most disturbing aspect in this case.

10. As of May, 1980, NABC established a practice with the debtor whereby each morning the debtor would call NABC to ascertain the total amount of its checks drawn on its account at NABC which had been presented for payment at the bank. NABC would either pay or refuse each check presented by 12 o'clock noon, provided that the debtor would deposit by the close of business that day, or at the latest by 9 o'clock in the morning of the following day sufficient funds represented by third party checks (customer's checks) to cover the overdraft created that morning. An additional deposit of $300 to $500 per day was originally required, which was increased by agreement to $2,500 per day after May 14, 1980. This additional deposit over and above the overdraft created each day was required in order to reduce a previous overdraft at the bank and to repay accrued interest with respect to the debtor's outstanding obligation to the bank. NABC agreed to honor the debtor's checks presented for payment on the promise that the debtor would provide good checks to cover debtor's checks plus the agreed upon $300 to $500 per day, which was subsequently increased to $2500 per day.

11. On occasions when the debtor was unable to inform NABC that it had sufficient third party checks to cover the checks presented plus the agreed upon $2500, NABC would not honor the presented checks drawn by the debtor to the extent of the overdraft.

12. On June 18, 1980, the debtor did not have sufficient third party checks to cover the potential overdraft resulting from checks presented to NABC drawn on its account. Therefore the debtor provided NABC with its own check drawn on its account with Barclays Bank of New York ("Barclays"), which account was used by the debtor as its payroll account for payment of wages to its employees. This

check, dated June 18, 1980, was in the amount of $30,467.11. [Exhibit "A"] The next day, on June 19, 1980, the debtor received third party checks totalling approximately $35,000. The debtor then informed NABC that it had sufficient third party checks to cover the overdraft; stopped payment on its Barclays check for $30,407.11 and submitted to NABC in lieu of that check, the third party checks aggregating $35,000.

13. Had the debtor not furnished NABC with sufficient third party checks in replacement of the $30,461.11 Barclays check, that check would have bounced because at no time during the month of June, 1980 did the debtor have sufficient funds to cover this amount; its highest balance during June being $18,694.80 on June 16, 1980. [Exhibit # 14] On June 20, 1980, the debtor's account at Barclays was overdrawn to the extent of $24,903. On June 23, 1980, the debtor's balance in the Barclays account was brought up to $17,497.99; on June 24, 1980 it was $15,345.32; on June 26, 1980 it was $14,634.27. The debtor's balance was then overdrawn on June 27, 1980 in the sum of $35,207.22 and continued to be overdrawn on June 30, 1980 to the extent of $10,244.81. [Exhibit # 14]

14. Thereafter, in accordance with its practice of submitting checks to NABC to cover overdrafts, the debtor delivered the following five checks to NABC, all drawn on the debtor's Barclays account at a time when its daily balance with Barclays, as indicated in the June 1980 Barclays statement [Exhibit # 14] reflected insufficient funds to cover the first four checks. The balance on July 1, 1980, the date of the last check, was not produced.

| Check date | Check Amount | Barclays Balance |
| --- | --- | --- |
| June 20, 1980 | $16,000 | $24,903 overdrawn |
| June 24, 1980 | 27,000 | 15,345 |
| June 25, 1980 | 7,114 | 1,265 overdrawn |
| June 27, 1980 | 3,823 | 35,207 overdrawn |
| July 1, 1980 | 16,840 | not produced |

15. The debtor's president stated that he thought that the debtor had sufficient funds on hand in the Barclays account to honor the checks and that the debtor also expected to receive substantial payments from its customers. He further said that when it became apparent that the Barclays checks could not be honored he thereafter stopped payment on them so as to prevent NABC from resubmitting them for payment. This argument rings hollow in light of the fact that it is clear that the debtor's officers knew that they could not pay its employees' wages from the Barclays account and at the same time use the Barclays account to satisfy its overdraft position with NABC.

16. The debtor was required to meet a payroll commitment every Friday, including June 20, 1980 and June 27, 1980. Its payroll obligations approximated $16,000 to $18,000 per week. That the debtor stopped payment after the checks were dishonored does not alter the fact that they were drawn at a time when there were insufficient funds to meet them. As the debtor's president testified: [Tr. 81]

"The money did not come in, and it was a choice of honoring the Nordic check or paying payroll. And I decided for the payroll."

However, even if the debtor did not meet its payroll obligations on June 20th and June 27th, totalling approximately $36,000 for two weeks, the additional $36,000 available in the Barclays account would not have been sufficient to enable the account to satisfy the five dishonored checks aggregating $70,777.

17. From the foregoing, it is apparent that the debtor obtained overdraft funds as a result of submitting covering checks to NABC drawn on an account that was insufficient at the time they were drawn and that the covering checks were subsequently dishonored, notwithstanding that the debtor thereafter instructed the drawee bank to stop payment. NABC would not have paid the debtor's checks drawn on the NABC account had it known that the checks which the debtor provided to cover its overdrafts were insufficient. The debtor's president knew that the Barclays covering checks could not be honored, especially after having chosen to use the funds in the Barclays account to meet the debtor's payroll obligation.

18. On the other hand, the debtor's accountant expressed concern as to how the monies that NABC claims are owed to it ever found their way into the debtor's coffers or how the debtor became obligated to NABC. [Tr. 235] He stated that when the debtor's president and representatives met with NABC with regard to certain promissory notes to be executed by the debtor, the debtor was not represented by counsel. The accountant recommended that the debtor submit the papers to its counsel for legal advice, which was not done. [Tr. 239]

19. There is an obvious need for an examination of all of the debtor's repayments for antecedent obligations, including the payments to NABC during the 90 days before the filing of the petition.

## DISCUSSION

This court is mindful of the fact that the appointment of a trustee "may be an extraordinary remedy and an additional financial burden to a hard pressed debtor seeking relief under Chapter 11." *In re Hotel Associates, Inc.*, 3 B.R. 343, 345, 6 BCD 160, 161 [Bkrtcy.E.D.Pa.1980]; and that under the Bankruptcy Code the presumption is that the debtor will continue in possession *In re La Sherene, Inc.*, 3 B.R. 169, 6 BCD 153 [Bkrtcy.N.D.Ga.1980]. However, Bankruptcy Judge King justified the appointment of a trustee in *In re Hotel Associates, Inc.*, stating: "The debtor may, in fact, benefit by having a court–appointed fiduciary supervise its operations. The trustee will seek to benefit all the creditors and will bring a refreshing air of objectivity and impartiality to a business which has been operated by and for the benefit of its primary creditor."

This court has found that the debtor has been guilty of fraud and dishonest conduct in its dealings with its sole secured creditor, NABC, by kiting checks and obtaining overdraft advances to which it was not entitled. It is true that this is not a case where fraud has permeated all the operations of the debtor. Nor does this case involve fraudulent transfers of property or the concealment of assets. The fraud and dishonest conduct affected one creditor, NABC, who the debtor describes as having pressed the debtor to the wall in the two months before the Chapter 11 commencement to have payments of $2,500 made daily in order to repay an antecedent debt which thereby depleted the debtor's cash flow so that the debtor was unable to provide covering deposits with respect to its overdraft privilege. However, the pressure exerted by NABC is no justification for fraud; although such conduct supports the conclusion that an impartial investigation is necessary with respect to all of the debtor's financial affairs and transactions, including those with NABC.

Section 151104(a)(1) of the Bankruptcy Code, 11 U.S.C. § 151104(a)(1) states:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall order* the appointment of a trustee—

(1) *for cause, including fraud*, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; . . . . [Emphasis added]

The question in this case is whether § 151104(a)(1) of the Bankruptcy Code mandates the appointment of a trustee upon the court's finding that the current management of the debtor committed a fraudulent act before the commencement of the Chapter 11 proceeding.

The legislative history of § 1104 of the Bankruptcy Code, upon which § 151104 is based, states "Section 1104 of the House amendment represents a compromise between the House bill and the Senate amendment concerning the appointment of a trustee or examiner." 124 Cong.Rec. H11102 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17419 (daily ed. Oct. 6, 1978).

H.R. 8200, 95th Cong., 1st Sess. § 1104(a), as reported by the House Committee on the Judiciary on September 8, 1977 provided that:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *may order* the appointment of a trustee only if—

(1) the protection afforded by a trustee is needed; and

(2) the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded. [Emphasis added]

The Report of the Committee on the Judiciary, House of Representatives, H.R. Rep. 95–595, 95th Cong., 1st Sess. 1977, which accompanied the version of H.R. 8200 reported on September 8, 1977 clearly indicates that the appointment of a trustee in a reorganization case is within the discretion of the bankruptcy judge. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 402. Although House Report 95–595 is frequently referred to in discussions of the Bankruptcy Reform Act such a reference would not be appropriate in this case in light of the fact that § 1104 as enacted is substantially different from the § 1104 to which House Report 95–595 relates.

Section 1104(a) and (b) of S. 2266, 95th Cong. 2d Sess., as reported by the Senate Judiciary Committee and the Senate Finance Committee on September 7, 1978 states:

(a) In the case of a *public company*, the court, within ten days after the entry of an order for relief under this chapter, *shall appoint* a disinterested trustee. In the event of a vacancy a successor shall be appointed by the court as soon as practicable. Section 1105 shall not apply to an appointment under this subsection. (b) In the case of a *nonpublic company*, at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest and after notice and a hearing the court *for cause* shown *may order* the election or if

the creditors do not elect a trustee the court may appoint a trustee. The court shall order the election, or if the creditors do not elect, the appointment of a trustee if such appointment would be in the interests of the estate and security holders. The creditor election permitted by this subsection shall be in the manner prescribed by and subject to the provisions of sections 702[702(a)(2)](2), 702(b), and 702(c) of this title. [Emphasis added]

The Report of the Committee on the Judiciary, United States Senate, S.Rep.No. 95–989, 95th Cong., 2d Sess. (1978), which accompanied S. 2266 stated:

Subsection (a) provides for the mandatory appointment of a disinterested trustee in the case of a public company . . .

In the case of a nonpublic company, the appointment or election of a trustee is discretionary if the interest of the estate and its security holders would be served thereby . . .

Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 115, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5901.

After the Senate adopted S.2266 as a substitute to H.R. 8200 the bill was sent back to the House where the floor managers met and agreed upon a compromise bill. This compromise bill was subsequently enacted as the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 et seq., and contains the version of § 1104 which is the subject of this controversy.

Section 1104 of the Bankruptcy Reform Act represents a compromise between the original H.R. 8200 and S. 2266, the Senate amendment. "The method of appointment rather than election, is derived from the House bill; the two alternative standards of appointment are derived with modifications from the Senate amendment, instead of the standard stated in the House bill." 124 Cong.Rec. H11,102 (daily ed. 9/28/78), 124 Cong.Rec. S17,418 (daily ed. 10/6/78). A reading of the original House and Senate versions of § 1104 leaves no doubt that Congress intended that the word "shall" was to be construed as a requirement and that the word "may" related to a matter of

discretion. This interpretation was followed in *In re La Sherene, Inc.*, 3 B.R. 169, 174, 6 BCD 153, 156 (Bkrtcy.N.D.Ga.1980) where Bankruptcy Judge Norton stated "Section 1104(a)(1) of the Bankruptcy Code provides that the Court must order the appointment of a trustee 'for cause' found."

 There being ample proof to conclude that the debtor abused its overdraft privilege by submitting covering checks drawn on an account with insufficient funds so as to obtain overdrafts deceitfully, the court must appoint a trustee because "fraud" is sufficient "cause" mandating such appointment under Code § 151104(a)(1). See *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 6 BCD 495 at 501 (E.D.N.Y.1980). However, the trustee will also review all of the debtor's business operations, including its transactions with NABC.

## CONCLUSIONS OF LAW

1. NABC has produced sufficient evidence that the debtor obtained overdrafts as a result of fraudulent conduct just prior to the commencement of this Chapter 11 case.

2. Such fraud constitutes "cause" for the appointment of a trustee under Code § 151104(a)(1).

3. The United States Trustee shall appoint one disinterested person to serve as trustee in accordance with Code § 151104(c). Such trustee may discretionally retain the present management with suitable controls.

IT IS SO ORDERED.