**In re CLINTON CENTRIFUGE, INC., Debtor.**

**Bankruptcy No. 86–03950G.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 17, 1988.

Lewis Kaitz, Kaitz & Mazzocone, and Paul B. Maschmeyer, Lashner, Victor & Maschmeyer, Philadelphia, Pa., for the movants, Aaron M. Lavin, and A.M. Lavin Mach. Works, Inc.

Lewis Kaitz, Kaitz & Mazzocone, Philadelphia, Pa., for movant, Lavin Centrifuge, Inc.

Jonathan H. Ganz, Pincus, Verlin, Bluestein, Hahn & Reich, Philadelphia, Pa., for debtor, Clinton Centrifuge, Inc.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Before me is the motion of Aaron M. Lavin, A.M. Lavin Machine Works, Inc. and Lavin Centrifuge, Inc. requesting the appointment of a trustee to operate or manage this chapter 11 debtor, pursuant to 11 U.S.C. § 1104. Movants contend that the prepetition and postpetition activities of the debtor's principal and sole shareholder, in both establishing the corporation Equipco, Inc. and in the dealings between Equipco and the debtor, justify the appointment of the trustee. The debtor, through current counsel, possibly concedes some small failure to follow all bankruptcy code provisions but argues that the appointment of a trustee is unwarranted.

To place this dispute in context, I must first review an earlier decision rendered in this case.

### I.

These same three movants filed a previous motion to dismiss this bankruptcy case which I denied, 72 B.R. 900 (Bankr.E.D.Pa. 1987) *appeal pending,* and for which I

made various factual findings. For purposes of understanding the current dispute, I shall summarize those findings.

Aaron M. Lavin established and is the sole shareholder of A.M. Lavin Machine Works, Inc. ("Machine Works"). The business purpose of Machine Works was the assembly, manufacture, sale and repair of basket-type centrifuges and other equipment. During 1980, Lavin decided to sell his business to William D. Clinton, sole shareholder of the debtor. Rather than simply selling the stock of Machine Works, Lavin entered into an agreement whereby Clinton would form another corporation called Lavin Centrifuge, Inc. and this corporation would purchase some of the assets of Machine Works. In relevant part, this agreement called for payments of $100,000.00 at settlement; $1,000,000.00 in ten years; minimum royalty payments of $120,000.00 per year for ten years (payable monthly); and excess royalties of 3% if "net sales" exceeded $1,000,000.00 per year. In addition, Lavin agreed to rent his plant to Clinton for a monthly payment of $2,000.00; other assets of Machine Works were to be sold for $85,403.00; and Lavin agreed to lend up to $100,000.00 to Lavin Centrifuge as operating capital. As security for this agreement the Lavin Centrifuge stock, though titled in Clinton's name, was placed in escrow. Upon default, the stock would be transferred to Lavin, subject to Clinton's defined right to cure the default.

By April 1983, Lavin Centrifuge was unable to meet its financial obligations to Lavin and Machine Works. Clinton then formed a second corporation, Clinton Centrifuge, Inc., and in early April 1983 transferred all of the assets of Lavin Centrifuge to Clinton Centrifuge in exchange for $135,787.00 evidenced by a five year note. This transfer followed a bulk transfer notice to Lavin and Machine Works—to which they objected. Suit then followed in state court which resulted in judgment in favor of movants, as the bulk asset transfer was found to violate the Pennsylvania Fraudulent Conveyances Act, 39 P.S. § 360. The Court of Common Pleas ordered *inter alia:*

   a. that the bulk transfer of assets on April 6, 1983 from Lavin Centrifuge to Clinton Centrifuge be set aside as fraudulent pursuant to section 360 of the Fraudulent Conveyances Act, 39 P.S. Section 360;

   b. that the transferred assets or their equivalent be returned to the control and dominion of Lavin Centrifuge;

   c. that the profits generated by Clinton Centrifuge, as a result of its possession of the transferred assets, be returned to Lavin Centrifuge;

   d. that ownership of all authorized and outstanding capital stock of Lavin Centrifuge be transferred and delivered to Lavin; and

   e. that Lavin and Machine Works failed to prove that Clinton, Lavin Centrifuge and Clinton Centrifuge fraudulently misrepresented any facts concerning the agreement of sale among Lavin, Machine Works, Lavin Centrifuge and Clinton or concerning the April 6, 1983 bulk transfer.

72 B.R. at 903.

When the state court defendants could not post a supersedeas bond to protect assets from execution pending appeal, Clinton Centrifuge filed this chapter 11 petition.[1] However, Clinton did more. Fearing that the Lavin plaintiffs might ulti-

---

**1.** I had noted that I would not retry this dispute under the guise of proof of claim litigation. 72 B.R. at 907 n. 4. *See also* Ferriell, *The Preclusive Effect of State Court Decisions in Bankruptcy* (Second Installment), 59 Am.Bankr.L.J. 55, 80 (Winter, 1985). Nor could the debtor's state court appeal proceed unless the automatic stay established by § 362(a) was lifted, as required by the Third Circuit Court of Appeals. *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir.1982). Remarkably though, movants inform me that the appeal did in fact continue and that the Pennsylvania Superior Court affirmed the lower court judgment in all respects. (No. 963, Phila.1986). In resolving this motion, I express no viewpoint regarding the propriety of the conduct of parties which has caused this turn of events. I do note, though, that the Superior Court interpreted the lower court decision as "elect[ing] to return the cross-appellants [movants here] to the positions in which they would have been at the time of the hearing rather than to grant specific performance of the original agreement...." slip op. at 15.

mately execute upon Clinton Centrifuge assets, he formed a third corporation, Equipco, Inc. in October 1985. Clinton is the sole shareholder of Equipco, which has no employees; its books and records are located at the debtor's premises. Equipco's sole business is the leasing of equipment, machinery and automobiles to the debtor, and it purchases these items from capital contributed by William Clinton or through financing guaranteed by William Clinton. In other words, rather than contributing new capital to the debtor which might be reached by Lavin, the debtor meets its equipment needs by lease arrangement with Equipco. Lavin, who was troubled by Clinton's formation of a new corporation in 1983 (Clinton Centrifuge, Inc.), is no less troubled by the formation of this third corporation.

Evidence at trial discloses that Equipco has a single lease with the debtor which was entered into in October, 1985. Items such as equipment leased to the debtor are listed on separate schedules. Originally, the term of the lease was for one year; however, Equipco and the debtor have extended the lease term to a three year period with some reduction in monthly payments resulting. Not only have prepetition leases been extended postpetition, but additional items have been leased postpetition. In fact, far more items have been leased postpetition than prepetition. (See Exhibit P–19). The debtor concedes that all postpetition lease agreements were entered into without any notice to creditors and without court approval.[2]

As a practical matter, all lease terms have been determined by William Clinton who is the sole shareholder of both the debtor and Equipco. Although Mr. Clinton testified that he selected the rental payments based upon written surveys he reviewed, there is no dispute that Equipco has been profitable since its inception. Using a fiscal year ending November 30, (which is the same fiscal year the debtor employs), Equipco has filed tax returns disclosing that: between October 1, 1985 and November 30, 1985, it had taxable income of $16,677.00 on rental receipts of $20,679.00; between December 1, 1985 and November 30, 1986, it had taxable income of $27,225.00 on rental receipts of $66,643.00. No figures were given for 1987, but Clinton acknowledged that rental income had increased for 1987. Similarly Equipco's asset value listed on its tax returns had increased from $63,743.00 in 1985 to $149,242.00 in 1986. All revenues of Equipco were derived from its lease agreement with the debtor. Moreover, it is unclear how much Clinton himself has invested in Equipco beyond his initial capital investment of approximately $42,000.00.[3]

While Equipco's fortunes have improved postpetition, the debtor's financial picture is mixed. Looking first at pretax profit figures, the debtor made a pretax profit of approximately $83,000.00 in 1983, $93,000.00 in 1984 and $27,000.00 in 1985. In August 1986, the debtor filed its voluntary bankruptcy petition. In 1986, it suffered a pretax loss of $9,000.00. (No information for 1987 was offered). Shareholder equity (defined in the debtor's unaudited yearly financial statements as assets less liabilities)[4] has shown a fairly steady increase, from $64,000.00 in 1983 to $199,000.00 as of June 1987.

Movants argue that Equipco is just another example of Clinton's misuse of a corporate vehicle. Unless a trustee is appointed, they contend Equipco will continue to be used as a vehicle for Clinton to siphon cash from the debtor for his own uses; moreover, they believe that only a trustee can take the necessary steps to recover prepetition and postpetition funds wrongfully paid to Equipco. In movants' view,

---

2. In fact, the existence of the prepetition Equipco lease arrangement was not disclosed until months after the commencement of the case when the debtor filed an amended schedule of executory contracts.

3. It appears that Equipco does not have much, if any, debt still owing on the purchase of its equipment. In all likelihood, the additional equipment purchased by Equipco after October 1985 came from funds derived both by additional Clinton investment and lease revenues.

4. It does not appear that shareholder equity includes the debtor's obligation to the movants.

these factors, taken together with the debtor's alleged failure to comply with 11 U.S.C. § 363(b)(1), warrant the imposition of a trustee. Of course, the debtor argues otherwise. It maintains that the lease agreements were in the ordinary course of its business so as to be governed by § 363(c)(1) and thus that no notice was required. It argues that lease terms were fair and beneficial both to the debtor and Equipco. Finally, it argues that any errors committed by Mr. Clinton were done unintentionally, on the advice of prior counsel, and do not support the appointment of a trustee, which is an "extraordinary" remedy.

## II.

Movants seek the appointment of a trustee pursuant to the provisions of 11 U.S.C. § 1104(a), which states

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

In sum, section 1104(a) "provides for [the] appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement, or if such appointment is in the interest of creditors", or other interests of the estate, including those of equity security holders. *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1134 (10th Cir.1988). *See In re Philadel-*

*phia Athletic Club*, 15 B.R. 60, 62 (Bankr. E.D.Pa.1981) (consideration of interests of equity holders).

To the extent one looks to legislative history for assistance in either defining "cause" or simply to obtain a general sense of congressional intent, one finds little guidance. Bankruptcy courts quickly discovered that "[b]ecause both the House Report and the Senate Report dealt with versions of section 1104(a) that were not enacted into law, there is very little relevant legislative history on the section." *In re Hotel Associates, Inc.*, 3 B.R. 343, 345 (Bankr.E.D.Pa.1980) (footnotes omitted). *Accord In re Parr*, 1 B.R. 453, 457 (Bankr. E.D.N.Y.), *rev'd. on other grounds* 3 B.R. 691 (E.D.N.Y.1979). The House version left, in all instances, the appointment of a trustee to the broad discretion of the court. The Senate version mandated the appointment of a trustee for "public companies" (as defined) but left the question of trustee appointment for nonpublic companies subject to court discretion. *See Matter of McCordi Corp.*, 6 B.R. 172, 177 (Bankr.S. D.N.Y.1980). The compromise reached draws no distinction between publicly held and privately held companies. Moreover, pursuant to § 1104(a)(1), a court must appoint a trustee once "cause" is found, *see In re Oklahoma Refining Co.*, 838 F.2d at 1136; while section 1104(a)(2) leaves the court with broad discretion to determine whether the interests of all constituencies would benefit from the appointment of a disinterested trustee.

To state that "cause" mandates the appointment of a trustee does not help to define that term. The use of terms such as "fraud, dishonesty, incompetence, or gross mismanagement" provide a little assistance —perhaps the outline of the framework rather than the framework itself. For example, early on, one court noted:

Under subsection (a)(1), the court's discretionary powers are more circumscribed. Here, the court's discretion is limited to a determination of whether "cause" exists for such appointment, and such "cause" must be in the nature of "fraud, dishonesty, incompetence, or gross mismanagement" of the debtor by

current management, either before or after the commencement of the case. Since one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protection of chapter 11, the court must find something more aggravated than simple mismanagement in order to appoint a trustee.

*Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644–45 (Bankr.E.D.N.Y.1980). This notion was concisely echoed recently by the Fourth Circuit Court of Appeals:

> [T]he concepts of incompetence and dishonesty cover a wide spectrum of conduct and ... the court has broad discretion in applying such concepts to show cause.

*Dalkon Shield Claimants v. A.H. Robin Co., Inc.*, 828 F.2d 239, 241 (4th Cir.1987). *Accord In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr.E.D.N.Y.1984).[5]

▮▮▮▮ Therefore, it appears, as with the provisions of 11 U.S.C. § 362(d), (which also contains the notion of "cause"), that the application of § 1104(a) was meant to be determined by decisional law on a case to case basis. *In re Paolino*, 53 B.R. 399, 401 (Bankr.E.D.Pa.1985) *aff'd.* 60 B.R. 828 (E.D.Pa.1986). In reviewing the facts established by the record in this contested matter I note, as have many other courts, that there is strong presumption in chapter 11 that the debtor is to continue in control and possession of its business. The appointment of a trustee is viewed as an extraordinary remedy, for when a trustee is appointed, the trustee displaces current management and assumes the decisionmaking functions. *In re Casco Bay Lines, Inc.*, 17 B.R. 946, 952 (Bankr. 1st Cir.1982); *In re Cole*, 66 B.R. 75 (Bankr.E.D.Pa.1986); *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr.M.D.Tenn.1985). As a result, the evidence needed to justify the appointment of a trustee must be "clear and convincing"—as opposed to the usual preponderance standard. *In re Paolino*, 53 B.R. at 401; *In re General Oil Distributors, Inc.*, 42 B.R. at 409. *In re Tyler*, 18 B.R. 574, 577 (Bankr.S.D.Fla.1982).

Finally, although written in reference to section 1104(a)(2), the following statement well articulates how court discretion may be applied when concerned with the appointment of a trustee:

> In determining whether the appointment of a trustee is in the best interest of creditors, a bankruptcy court must necessarily resort to its broad equity powers. In equity, as no where else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests.... Moreover, equitable remedies are a special blend of what is necessary, what is fair and what is workable.

*In re Hotel Associates, Inc.*, 3 B.R. at 345 (citations omitted).

### III.

Movants seek the appointment of a trustee pursuant to § 1104(a)(1), and (2). However, although the motion for appointment makes reference to the best interest language of (a)(2), all of the evidence present-

---

5. Despite the use of the word "shall" in § 1104(a), most courts have recognized that the general terms utilized in § 1104(a) leave considerable room for court discretion. *Dalkon Shield Claimants v. A.H. Robins Co. Inc.; In re General Oil Distributors Inc.*, 42 B.R. 402 at 409 (citation omitted):

> Although the word "shall" in § 1104(a) circumscribes the court's discretion, the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct. While under § 1104(a)(1) the court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore competing benefit and harm that such an appointment may place upon the estate.

\* \* \* Implicit in a finding of incompetence, dishonesty, etc., for purposes of § 1104(a)(1), is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee.

This viewpoint is supported by 11 U.S.C. § 1105 which gives the bankruptcy court "uncircumscribed power to terminate" the trustee's appointment. *In re General Oil Distributors, Inc*, 42 B.R. at 409. It is difficult to maintain that a court has no discretion in deciding when a trustee is needed but unfettered discretion to terminate the appointment. *In re General Oil Distributors, Inc. See also In re Eastern Consolidated Utilities, Inc*, 3 B.R. 591 (Bankr.E.D.Pa. 1980).

ed was designed to show that cause exists under § 1104(a)(1). Therefore, I shall focus upon the question of "cause".

Although the appointment of a trustee is viewed as extraordinary, there are a surprisingly large number of decisions involving issues under 11 U.S.C. § 1104(a)(1). Categorization of these decisions is not straightforward but one commentator has grouped decisions in which the appointment of a trustee has been ordered as follows:

conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries;

misuse of assets and funds;

inadequate recordkeeping and reporting; nonfiling of required documents, including lack of adequate disclosure;

lack of appropriate cost controls;

various transgressions as to taxes, including nonpayment of taxes, failure to file returns, and nonwithholding of taxes; various instances of conduct found to establish fraud or dishonesty;

failure to make required payments; and lack of credibility and creditor confidence.

5 *Bankr.Service—L.Ed.* § 41.30 at 49–50 (1987). Since movants are tying their request for appointment to the debtor's relationship and business dealings with Equipco, particular relevance is afforded to those decisions concerning intercorporate dealings.[6]

There are a phlethora of decisions justifying the appointment of a trustee, pursuant to 11 U.S.C. § 1104(a)(1), because of questionable business dealings between a debtor corporation and a related, nondebtor entity. *See e.g., In re Oklahoma Refining Co.,* 838 F.2d at 1136; *In re McCorhill Publishing Inc.,* 73 B.R. at 1017. Among the sensible rationales offered for concluding that cause exists under § 1104(a)(1), is that the debtor entity is not being operated

in a fiduciary capacity, by current management, for the benefit of all creditors and equity security holders. *See Matter of U.S. Truck, Inc.,* 44 B.R. 311 (Bankr.E.D. Mich.1980); *In re Concord Coal Corp.,* 11 B.R. 552 (Bankr.S.D.W.Va.1981). That same concern is occasionally expressed by a court's concluding that existing management has conflicting interests involving both the debtor and nondebtor entities. *See e.g., In re L.S. Good & Co.,* 8 B.R. 312 (Bankr.N.D.W.Va.1980).

Equally troubling is when the debtor's management uses a nondebtor entity to divert property of the estate so that it is no longer available for creditors. When that occurs, courts have been quick to appoint a trustee in order to prevent further dissipation of assets and to insure recovery of those assets already transferred. *See e.g., In re Russell,* 60 B.R. 42 (Bankr.W.D.Ark. 1985); *In re Bonded Mailings, Inc.,* 20 B.R. 781 (Bankr.E.D.N.Y.1982); *In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60 (Bankr.E.D.Pa.1981); *In re Main Line Motors, Inc.,* 9 B.R. 782 (Bankr.E.D.Pa.1981).

The Lavin creditors argue strenuously that the factual scenario which they have presented is akin to those cases just mentioned and warranting a similar result. However, on close analysis, I cannot agree. The existence of a related corporate entity which has not filed bankruptcy does not, by itself, constitute cause for appointing a trustee. *In re Tyler,* 18 B.R. 574, 578 (Bankr.S.D.Fla.1981). Moreover, the fact that a corporate debtor engages in a business relationship with a related business entity "does not *de jure* establish a conflict of interest." *In re F.A. Potts & Co., Inc.,* 20 B.R. 3, 4 (Bankr.E.D.Pa.1981).

■ In the matter at bench, there is no basis for holding that Equipco was formed to compete with or supercede the debtor. Absent the lease payments which will be

---

**6.** Movants do not assert that the debtor has failed to maintain complete and accurate business records, *see In re McCorhill Publishing, Inc.,* 73 B.R. 1013 (Bankr.S.D.N.Y.1987); nor do they argue that the debtor has failed to properly supervise its comptroller, *see Matter of Anchorage Boat Sales, Inc.,* 4 B.R. 635 (Bankr.E.D.N.Y. 1980), or failed to file accurate financial reports. *In re Cohoes Industrial Terminal, Inc.,* 65 B.R. 918 (Bankr.S.D.N.Y.1986); *In re Paolino; In re Matter of Denrose Diamond,* 49 B.R. 754 (Bankr.S.D.N.Y.1985). To the contrary, the debtor has kept careful records which has enabled the movants here to discover the full nature of the dealings between the debtor and Equipco.

discussed below, no assets of the debtor were diverted to Equipco; no commingling of records or accounts occurred; no business was foregone in favor of Equipco. The evidence presented reflects that the debtor utilized the machinery and equipment rented from Equipco to generate additional business whose revenues inured to the debtor's estate. While I question the procedure by which the lease agreements were effectuated, I cannot conclude on the record before me that the monthly lease payments were excessive.[7] Thus, I cannot find the fraud or dishonesty which movants believe exists by virtue of the lease agreement. *F.A. Potts & Co., Inc.*

In fact, absent any showing that the lease agreement was unreasonable, or that the debtor had no need for the Equipco equipment and machinery, it is difficult to articulate (except for the § 363 issue), what "cause" exists for appointing a trustee. In large measure, movants argue that even if the lease agreement was commercially reasonable, Clinton had a duty to invest his funds into the debtor rather than invest it in another corporation which would make a profit from its dealings with the debtor. Absent some support for this sweeping proposition, which has not been demonstrated by movants, and which I cannot discern independently, I cannot hold that Clinton violated some fiduciary duty in establishing Equipco.[8]

This is not to say that where a debtor, (or its principal), makes analysis of the fairness of a transaction impossible, the burden on a party seeking the appointment of a trustee might not be more easily met. *E.g., In re Philadelphia Athletic Club.* In the instant matter, although sophisticated creditors with both sufficient resources and incentive to thoroughly investigate the debtor's financial dealings have had ample opportunity to so investigate, there is no suggestion that the debtor's books and records are deficient. In light of this, the heavy burden on movants to establish some impropriety on the debtor's part remains. This burden has not been met here, at least insofar as the establishment of Equipco is concerned.

## IV.

A more difficult question relates to the debtor's postpetition conduct. Numerous leasing arrangements were entered into or extended postpetition without any notice to any creditor or any opportunity for court review. The debtor justifies its actions by arguing that all of its postpetition dealings with Equipco were in the ordinary course of its business and so, by virtue of 11 U.S.C. § 363(c)(1), no notice was required. Movants suggest that these transactions were outside of the ordinary course of business and so the notice and hearing provisions of § 363(b)(1) applied. Movants then extrapolate and argue that a violation of § 363(b)(1) represents sufficient cause *to* appoint a trustee.

The most complete articulation of the standard, "ordinary course of business", is found in *In re Johns–Manville Corp.,* 60 B.R. 612 (Bankr.S.D.N.Y.1986). A two part analysis is offered: A transaction is in the ordinary course of business if; (a) the transaction is consistent with the day to day operations of the debtor and is consistent with a creditor's reasonable expectations of what transactions the debtor is likely to enter into while operating its business ("vertical dimension test"); or (2) the transaction is of a type engaged in by businesses similar to the debtor's ("horizontal dimension test"). *Accord In re Newton,* 64 B.R. 790, 794 (Bankr.C.D.Ill. 1986).

Under either test, these leasing transactions were outside the ordinary course of business.

---

7. If movants could demonstrate that the lease agreements were commercially unreasonable my position may well be different. Having not yet so demonstrated, their request for a trustee may be premature. *See In re Fisher & Son, Inc.,* 70 B.R. 7 (Bankr.S.D.Ohio, 1986).

8. I am not faced here with a factual scenario whereby a sole shareholder seizes a corporate opportunity away from a corporation. The unrebutted testimony was that Clinton Centrifuge did not have the capital needed for equipment and machinery expansion. *See Matter of Century Glove, Inc.,* 73 B.R. 528 (Bankr.D.Del.1987).

The debtor's business concerns the repair, manufacture, assembly and sale of centrifuges; it is not in the equipment renting business. Prior to October 1985, it owned all of its own equipment (albeit the equipment may have been financed), which it made available to creditors as a corporate asset. In October 1985, the debtor made a decision to cease increasing or replacing its machinery and equipment assets in order to avoid potential execution by creditors. Since October 1985, it has significantly increased its use of leased machinery and equipment to levels never approached prepetition. Moreover, there is no evidence to demonstrate that such an arrangement is an industry norm. On the contrary, the evidence reflects that neither Lavin Machine Works, Inc. nor Lavin Centrifuge, erstwhile predecessors of the debtor, ever used such a leasing arrangement.

Therefore, the postpetition lease transactions were governed by § 363(b)(1) and notice prior to consummation should have been provided. This conclusion is buttressed by the potential for self-dealing which exists in this leasing arrangement. Obviously, the lease terms are established, not by arms-length bargaining or market forces, but by the dictate of Mr. Clinton. Closer scrutiny of such arrangements are warranted in bankruptcy proceedings than are needed when arms-length negotiations occur. *See In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15 (Bankr.E.D.Pa.1987); *In re Au Natural Restaurant, Inc.*, 63 B.R. 575 (Bankr.S.D.N.Y.1986); *In re Rittenhouse Carpet, Inc.*, 56 B.R. 131 (Bankr.E.D.Pa. 1985).

### V.

My conclusion that the debtor has violated § 363(b)(1) does not, in the context of this bankruptcy case, provide cause for appointing a trustee. This is not a case where there are hundreds of relatively small creditors who either collectively (by committee) or individually would be unable to act to insure that the debtor will henceforth comply with all bankruptcy code provisions and act to undo the harm, if any, which has already occurred. Here, there are very few creditors of which movants are the largest. They are acting and have acted as a check on the debtor's actions throughout these proceedings. For example, they have initiated turnover complaints against Equipco to bring back into the estate any proceeds improperly paid out. *Cf. In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3d Cir.1986) (individual creditor can act in lieu of a debtor in possession in some circumstances where the debtor in possession fails to act).

In sum, I agree with the decision of *Dalkon Shield Claimants v. A.H. Robins, Inc.* and *In re General Oil Distributors, Inc.*, that whether cause exists to appoint a trustee is largely a matter of degree. In most bankruptcy cases there will be some display of mismanagement, some disregard or oversight of statutory provisions, and some legitimate concerns raised by creditors that creditor interests would be better served by replacing current management. The question becomes whether these concerns rise to a level justifying extraordinary relief. In this case, under movants' watchful eye, the conduct of the debtor will be sufficiently monitored as to make the appointment of a trustee unnecessary. *In re General Oil Distributors, Inc.*, 42 B.R. at 410. If, though, movants believe that they do not have sufficient access to information to enable them to monitor the debtor's performance, in light of the debtor's postpetition dealings with Equipco, I may appoint an examiner. *See Matter of Hamiel & Sons, Inc.*, 20 B.R. 830 (Bankr.S.D. Ohio, 1982) (examiner appointed to determine whether trustee is necessary). Moreover, if the debtor is unable to confirm a chapter 11 plan soon, and does not provide a sound basis for this inability, movants may wish to renew this motion or again seek dismissal under § 1112.

An appropriate order will be entered.[9]

Bankr.Rules 9014, 7052.

---

**9.** This memorandum opinion constitutes the requisite findings and conclusions mandated by

## ORDER

AND NOW, this 17 day of May, 1988, upon consideration of the evidence presented at hearing and the submission of the parties;

it is hereby ORDERED the motion of Aaron M. Lavin, A.M. Lavin Machine Works, Inc. and Lavin Centrifuge, Inc. for appointment of a trustee pursuant to 11 U.S.C. § 1104 is DENIED, without prejudice.